Our fourth and final oral argument today is Doctrine No. 25-1367, In Re Hybir. May it please the Court, my apologies. I hope the mask won't be an issue. I started to not feel well on the train ride it down. We called the court, court said, I better come. So I'm here. I'm going to power through this, but I figure better safe than sorry. I don't think what I have is contagious. I think it's something I ate, but I went to med, I did not go to med school. I went to law school, so I won't make those judgments. I'll just assume. Okay, I'm glad you're here. Can I ask you a question like housekeeping? The agreement that you filed the other day is under seal. Do you consider paragraphs 2.4 and 2.5 of the agreement confidential? I mean, are they considered confidential, preamble confidential? I just want to make sure we can talk today. The counterparty, I am okay discussing it publicly. So my client and I are fine with that. We did comply with the confidentiality obligation to notify the counterparty that we were doing this. They raised no objections. So I'm going to just go with that. It's okay to discuss publicly. The entire agreement or just parts 2.4 and 2.5? The entire agreement. The counterparty is aware, being SOFR, is aware that I'm here today. So if they had any objection, they may have waived it. I don't see anybody in the courtroom anyway, except for our law clerks and our staff. So if we cleared the courtroom, we would still have the same people. Oh, I just, I wanted to know if for purposes of any opinion or anything like that, it's really... It's the advantage of being last, I suppose. But the, as Your Honor, as you point out an issue... I have not recorded the argument. They have been silent. So I'm just assuming they're waiving. They're aware that this is an issue that Your Honors want to discuss. So that's it. That's my position on that. And my client is fine with it. So I guess you probably, I guess the court wants to start with this issue, because it's a threshold issue as to whether you're going to address the other issues. Yes. Do you have an argument to distinguish this court's decision in AVID and why it is that in this case, the appeal wasn't moved? Yes. Those two decisions and others, but two that the court pointed out, the Allflex and the AVID decisions, were in both cases, there was a definitive resolution of the case, depending on the outcome of the appeal. The appeal went one way, then it was this. The appeal went another way, this is, they either pay it or they don't pay it. It was definitive, meaning regardless, there was no other decision to be made after that. There was no discretion. It was just the fact is, if the appeal was won one way, there would be an exchange of money, and if it wasn't, there wasn't. In this agreement, that's not the case. In this agreement, the patent that's at issue in this appeal, in this case, is specifically excluded from this agreement, and then there's an option on behalf of the counterparty, the BM Software, to have it be included after they get to see how this appeal comes out. Well, isn't it kind of obvious that if the claims are found eligible, then someone's going to pay $100 to license the patent, and if the claims are found ineligible, then they won't? Right. The money is not the issue here. The issue is... I'm just saying that it doesn't seem too unclear to me what the outcome is. Why isn't that, why isn't the outcome about what's going to happen as a result of this appeal, why is it unclear? Okay. This is a limited license, and if your honors determine that the Section 1 determination was wrong, and they vacate, and we're back to the district court, it's quite likely that the defendant will want to take another crack at invalidating the patent another way. The limitation... You don't think that Game will just pay the $100? No. They'll want to keep pursuing litigation? Yeah. And the reason is because there's a limit, this is a limited license, and in Section... No, keep going. In Section 2.1, the license, explicitly it says, the license, the end of the section says, the license will not extend to any third-party entity that becomes an affiliate, as defined herein, after the effective date for any product, service, or solution that is both, one, not associated with DataVium, and two, existed as a separate product, offering, or other solution or service of the third-party entity prior to becoming an affiliate. So, what that means is, if Vium, the defendant, had acquired another company, that company's technology would not be covered by this license. So, they would be most likely motivated to try to take a third crack, because we've already gone through IPRs that limited down to six claims, now we've had this ruling on the 101, but because of that limitation on the license, they may very well decide that they have to fight this. And in fact... The question I have is, the question is whether there's a real case of controversy. It has to be eminent, it has to be concrete, and all we've got is you standing here saying, it's most likely they will want to do this or that, without any evidence or any... It feels hypothetical, I would say. Well, I was only giving that in response to your honest question, why wouldn't they? You asked me their motivation, so I answered the motivation. The agreement has this limited language. It limits the license to, it can't include an entity... Let me ask you this, if the agreement wasn't they have the option to pay $100, but they have to pay $100, would it be moot under that case? Potentially, yes, because it's a definitive resolution. In that sense, it would be the same as those two other cases. I still don't understand why they wouldn't pay $100, even if some time down the line, they might purchase a company that's subject to it again. They're getting rid of the dispute for now, and this dispute, and they'll still have a one-on-one argument down the road if it happens. That seems... Why would they have ever agreed to this agreement at all for $100 if they didn't intend to exercise it? Again, now you're asking me to... Now I'm going to speculate as to their motivation. Your argument is, you're speculating. That's why you are speculating about the fact that this doesn't resolve the case, because you think they might choose not to pay $100 and go ahead and defend on other invalidity grounds. I mean, if they were really concerned about this patent being invalid or ineligible, they would be sitting here defending it now. Instead, if they got the option, we don't have to do anything. Even if we lose this appeal, all we have to do is pay $100. Right, and for that $100, they... That moots this case. It may not moot future cases where you can sue their later acquired companies, but doesn't that moot this infringement action? If they pay the money, it moots the cases over. The fact that they have the option to pay the money is different than prior moot cases. That's... There are other restrictions that come if they exercise this option. For example, Section 2.7... Let me ask you this. If they exercise the option, is the case moot? I don't think that, with all due respect, I don't think it's a fairly worded question. The issue of whether it's moot is today. Is the case moot today? Every case is moot after it settles. If a case settles, well, but not entirely, the patent, that issue in this case, is not included in the agreement. It's explicitly excluded, so it's not currently licensed. And if they choose, it's up to them, not my client, what happens after, you know, what the disposition of this is. There are other restrictions that would come into play if they exercise it. Section 2.7 would restrict their ability to challenge the validity of the patent. So again, if their affiliate is an issue, they would not be able to participate in that defense. And then there's other provisions about restrictions on assignment and breach. So they would be limited by all of those restrictions in this agreement, should they choose to exercise the option. So again, I could speculate all day, and then you'll say I'm speculating, but I don't know how else to answer those questions. Why wouldn't they do this? The agreement speaks for itself. It has some restrictions that weigh against it. In any event, it's in fact not a definitive resolution. It is just an option, so it is distinguishable from those prior cases on that basis. And there are other cases from this court, like the Unilock versus Hulu case, which have said that a case is moot only if it's impossible not to grant effectual relief whatsoever. So here, it's not impossible. It's possible to grant effectual relief. The patents could be revalidated. The decision to invalidate could be overturned. And again, that provides the option to defendant, as well as gives my client the option to pursue other infringers, which is a value that was recognized by this court in the Sanhov versus Kijek case. I'm probably mispronouncing that, so for the record, I'll just say that it's 108 F. 4th, 1376, which recognized as an equally illegally cognizable interest in the outcome of an appeal could be the ability to assert a patent against others. So it's really not about the $100. That's consideration, in effect. That's just minimal consideration. Any other questions about the mootness issue? And would Your Honor want me to actually address the substance? I do have one question about the substance, and that's when I read the background of this patent in Column 1. I was just trying to understand what is the nature of the asserted advance in this patent claim, because when I look around Column 1, Line 44, it talks about how there were already various techniques for reducing the size of backups, and that was to not copy data already backed up. And one technique for reducing the size of backups is to only copy the files that do not already exist. This technology utilizes a CRC 32 as a checksum along the file name designators to determine if a file is already in the repository. And this sounds a lot like the claim dimensions, which is to use descriptors, here it would be the CRC 32 as a checksum, to compare potential to be stored files against a ready repository stored set of files and checking these shorthand descriptors against each other to see if there's a need at all to copy in a particular file. Isn't that the claim dimension? No, Your Honor. There's a difference between client-side versus server-side checking. So what this is describing is the server-side technique, where they get all the data from the client computers, and then they run compares to see, do I have this file already, do I have this file already. What this invention is, is client-side checking. So basically the use of the signatures without having to send all of the files, without having to send the entire contents of the hard drive to the server, you just send the list of the signatures, then the server... The descriptors. Yes. And descriptors include things like a CRC 32. In this case, the particular claims talk about cryptographic signatures. Claims are limited to cryptographic signatures generated based on the content of the file. Sure. It's different than... Presentations.  It's just like CRC 32. Your claim is cryptographic. That was known in the art to do that. So then the claim dimension boils down to sending a list of descriptors to the server. I mean, this is already at the server doing the comparison. Right. So that's already off the table. It just comes down to transmitting a list of descriptors. Is that right? Yes. And what's the industry calls client-side checking. The main problem we had, just because I have a minute left, I'll just... On page Appendix 14 in the judge's ruling, this kind of just epitomizes the problem that we have, which is that she says the only potentially unique element of the 043 patent is the backup application, which combines the device backups, thereby reducing storage and network requirements. However, patenting the descriptor generating process would be patenting the algorithm itself. The problem is that she's sort of recognizing on the one hand that there's a technological environment of a backup system, which is not just a generic computer, like in the personal web decision. But then she's incorrectly, in our view, saying that, well, this would preempt essentially the entire algorithm, which it wouldn't because it's limited to a particular environment. So that is why we have been trying to argue in the brief that this case is closer to the CardioNet case, where the same judge made the same mistake, and this court corrected and said, no, the algorithm may be abstract, but it's used in a heart detection device. So the question really is, would the court consider a backup system closer to, like, a specific piece of technology, like a heartbeat detection device, or is it just generic processing? I'm over time, so... Thank you very much for coming. The case is submitted.